## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 OCT 22  AM 10: 30

CLERK _____
SO. DIST. OF GA.

|  |  |  |
|---|---|---|
| **William H. Carter**<br>**Plaintiff** | ) ) ) ) | |
| **vs** | ) ) | **Case No: CV 311-107** |
| **NCO FINANCIAL SYSTEMS**<br>**Defendant** | ) ) ) ) | |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS
## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, William H. Carter submits this Reply in response to Defendant's Reply in further support of its Motion for Summary Judgment and states:

1. Plaintiff re-states all statements included in his Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dkt#19).

2. Defendant, NCO's sole defense to the above styled action is a claim of permissible purpose to obtain Plaintiff's credit report. Their claim is based on a *"reason to believe"* an *"alleged account"* they obtained from FIRST PREMIER BANK was valid.

3. NCO has shown nothing in the record to substantiate that a *"reasonable belief"* could have existed other than the affidavits of an in house employee Gregory Stevens, who states; "according to NCO's records" there was an *account* placed with them by FIRST PREMIER BANK in the name of the Plaintiff, William Carter. There are more than 100 individuals listed in the White Pages with the same name in the State of Georgia alone. The second affidavit of Mr. Stevens states there are attachments of NCO's account records however there are no records of any type attached.

4. NCO has shown nothing in the record to indicate they made **ANY** attempt in **2009** to fulfill their duty to implement and maintain procedures to avoid errors before obtaining Plaintiff's credit report. Plaintiff has repeatedly requested such documentation of NCO doing so before and during litigation to no avail.

5. Until NCO subpoenaed FIRST PREMIER BANK's records on August 9, 2012 which clearly shows Plaintiff not responsible for the alleged account, (*See* Exhibit "R" attached), there is no evidence of ANY investigation or attempt to verify the information they claim to have been given in 2009. Only now, after Plaintiff has filed this instant action does NCO attempt to locate justification to show a foundation for ANY claim to a *"reason to believe"* they had a permissible purpose to obtain the credit report of the Plaintiff.

6. In the affidavits submitted by Gregory Stevens, affiant claims to be *"personally familiar"* with NCO's collection procedures from 2009 to the present. He further states he is *"familiar with NCO's files and records regarding collection accounts…"* The legal definition of the term *"familiar"* taken from Blacks Law Dictionary, Revised 4th Edition is:

    a. **FAMILIAR**: The word is equivalent to the word "know" *Smiley v. Lenane*, 363 Ill. 66, 1 N.E.2d 213, 216.
    b. **KNOW**: To have knowledge; to possess information, instruction or wisdom. *State v Ransberger*, 106 Mo. 135, 17 S.W. 290, *Horne v Lewis*, 160 Ga. 824, 129 S.E. 95.

7. According to Wikipedia and NCO's web site the company reported 1.6 billion USD in revenue for the year 2010, and employs at least 30,000 people at over 100 locations globally. It is more than reasonable to presume from those numbers alone that NCO acquires literally millions of accounts each year. Affiant, Mr. Stevens claims to have personal knowledge of NCO's accounts from 2009 to the present. Even to the most unsophisticated person, the sheer number of accounts in that time period would appear to place Mr. Stevens in a class by himself. Mr. Stevens would have to be a virtual millisecond speed reader and possess a memory which surpasses the largest main frame computer in the world to be *"personally*

*familiar"* with that number of accounts. Questions arise given the number of accounts NCO

processes on a daily basis;

    a. Prior to the commencement of collection activities and on a percentage basis how many of the accounts NCO receives does Mr. Stevens personally review sufficient to afford him the ability to testify as to their authenticity?

    b. On a percentage basis, how many accounts does Mr. Stevens review sufficient to be familiar enough to sign an affidavit on a monthly basis?

    c. How many accounts does NCO receive on a monthly basis?

    d. How many affidavits does Mr. Stevens sign on a monthly basis?

    e. At what point in time **prior to this instant action** did Mr. Stevens review and authenticate the *"alleged account"* at issue?

    f. Considering the evidently massive numbers of accounts how could NCO engage in **ANY** responsible due diligence to determine the authenticity of those accounts?

8. According to a registered Credit Services Organization, CreditFirm, NCO FINANCIAL

SYSTEMS

    a. **purchases defaulted consumer debt** for pennies on the dollar in an attempt to settle the accounts with consumers at full face value. The company has more than 100 offices, primarily in the US, but also in Antigua, Australia, Barbados, Canada, Guatemala, India, Mexico, Panama, the Philippines, Puerto Rico, and the UK.

    b. In 2006 NCO was bought by One Equity Partners (OEP), the private investment arm of JP Morgan Chase. (*a banking entity involved in massive investigations of fraudulent behavior in the mortgage and credit card collections industry.*) (*See* Exhibits "N", "O","P", attached here).

9. NCO has shown a dismal track record of "non-compliance" as is evidenced by the number of

successive legal actions filed against them such as:

    a. **Johnson v NCO Financial Systems 1999** Fed. Dist. Northern Illinois Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq. ("FDCPA").

    b. **2004**, NCO paid a **fine of $1.5 million to the Federal Trade Commission**, refusing to verify and validate the debt, contacting third parties about the debt, claiming that they were calling from a law firm, attempting to collect debt that was past the statute of limitations, and harassing and threatening people on the phone. In the "Consent Decree" **FTC File No. 992-3012**, dated **May 13, 2004**, found at the web site of the Federal Trade Commission under **"Findings" ¶3**,... **For purposes of this Consent Decree:**

        i. **"Defendants"** shall mean NCO Group, NCO Financial Systems Inc., and NCO Portfolio Management, Inc. unless otherwise specified;

        ii. **"Delinquency date"** shall mean the month and year of the commencement of the delinquency that preceded the reporting of an account to a consumer reporting agency as set forth in Section 623(a)(5) of the FCRA; and

        iii. The **definitions** set forth in the FCRA, 15 U.S.C. § 1681, shall apply.

(this date in the Consent Decree was **after** the enactment of **FACTA** which was **March 31, 2004** which would bind NCO to all new definitions within that **Congressional Amendment** to the **FCRA**.)

   c.  In **2006, NCO paid a $300,000** settlement to the **Commonwealth of Pennsylvania** for violations of the state's consumer protection statute.

   d.  **February 17, 2012 Minnesota Commissioner Mike Rothman** took action against 49 debt collection agencies nationwide that are owned and operated by NCO Financial Systems, Inc. According to the Department's investigation, the company allegedly failed to properly screen employees and employed known felons. In a consent order Commissioner Rothman ordered NCO Financial Systems, Inc. to overhaul its employee screening process and **pay $250,000 in civil penalties to the State of Minnesota**. Commissioner Rothman stated, "Employing convicted criminals to collect sensitive personal information from financially stressed consumers is against the law – and it cannot be tolerated."

   e.  **February 6, 2012** Alaska and 18 other states reached a settlement with NCO Financial Systems, Inc. resolving allegations of deceptive and unfair collection practices. NCOF agreed to pay **$575,000** to the states.

   f.  NCO consistently engages in non-compliance with the Federal and State Statutes regarding consumer privacy as is evidenced by the more than **2,000** actions filed against the company in Federal District Courts alone since **Jan. 1, 2009. More than 300 of those since Jan. 1, 2012.**

   g.  In the three year period ending **March 16, 2012** NCO had **1,116** complaints from consumers filed with the Better Business Bureau with the number of unreported instances of illegal practices unknown but likely substantial.

10. NCO has apparently adopted a **practice** of non-compliance treated as an acceptable risk and cost of doing business. Compared to the 1.6 billion USD in business revenue for 2010 the amounts they have been forced to pay as a result of litigation for violations of the FDCPA, FCRA and TCPA is a mere pittance.

11. The debt collector is assumed to be a sophisticated business entity "*familiar*" with the law, whereas the least sophisticated consumer is anything but by definition. For a debt collector to fail to fulfill its duty to authenticate information obtained in regard to consumers would constitute a "loophole", an 'end-run' around that duty creating a willful and *reckless disregard* of a consumers rights which would be inconsistent with the drafters' of consumer protection statutes intention of protecting debtors from "unfair, harassing, and deceptive collection tactics".

12. **American Banker** is a well-known industry and trade publication of the banking industry published since 1836. In Exhibits "N", "O", "P", (Id. at ¶8(b) ) *and* "Q". this Court can read

about the fraudulent robo-signing of many thousands of affidavits in support of litigation on credit cards that is but a follow-up to the massive fraudulent robo-signing of foreclosure documents nationwide that has literally thrown the property records of this entire country into complete disarray and has clogged the judicial system beyond capacity as consumers learn of this fraud and stand up to defend themselves. It would seem the statutes passed by Congress to protect the consumer have been stretched beyond their elastic limits resulting in dramatically escalating harm to consumers instead of the intended protections for them.

13. There is rapidly mounting evidence becoming public of the incredible fraud and abuse being perpetrated on consumers by banks and debt collectors such as the Defendant. It is not only prudent but is the responsibility of Plaintiff and all other consumers to question the actions of those who would attempt to collect any "*alleged debt*" from them.

14. It would seem highly unreasonable to assume that the intent of Congress in the passing of the FCRA, FDCPA and the TCPA was to afford blanket immunity to the debt collection industry to allow them to "run amok" under a self-serving doctrine of "*reason to believe*" in order to do anything they please. A breach of duty to perform due diligence in regard to consumers' personal information does not indicate a "*reason to believe*" but rather a self-proclaimed "free pass" to ignore the spirit of the law and run roughshod over the consumer invading their privacy at will.

15. The issue of "***reason to believe***" is clearly defined by Judge Sonia Sotomayor in **Miller v Wolpoff & Abramson, LLP, 2d Cir., No. 02-7017, Feb.25, 2003**, The case did not involve the FCRA, or "***permissible purpose***" under the FCRA however the case does address the issue of "***reason to believe***".

    a. The affidavits submitted by Defendants in the case indicate they reviewed no more than "*very limited information*" before collection action such as; *"Mr. Miller's full name, social security number, current address, telephone number and the Lord & Taylor account number, the amount of the debt and a notation that Mr. Miller was an attorney"*. The Court held that the "*information reviewed would not enable a determination of whether Mr. Miller was in bankruptcy, whether information in the*

*record was inconsistent or incomplete, whether Miller was or was not obligated to pay the debt, or whether Miller was the correct debtor."* The Court ruled that the information reviewed by W&A **did not entitle them to summary judgment** because it could not conclude that the information in Plaintiff's file was adequate to make these kinds of judgments. In addition the Court ruled that the information supplied above to UC & S partner Mitchell Slamowitz was **too insufficient** to support the conclusion as a "*matter of law*" that any professional judgment was exercised before collection efforts..

b. In regard to the standard of review by the Defendants, Judge Sotomayor stated; "On this undeveloped record, however, it suffices for us to hold that **merely being told by a client that a debt is overdue is not enough.**" See Nielsen v Dickerson, 307 F.3d 623,638 (7th Cir.2002). She further states; "These affidavits, however, lack sufficient detail to permit the district court or us to determine that their review was sufficient as a "*matter of law*." As Judge Sotomayor stated, "the conclusory language used in the affidavits did not adequately describe what information Abramson reviewed to exercise his "independent professional judgment".

16. NCO rests its entire defense on the premise of "*reason to believe*". The language of the

FCRA does not explicitly define that term however upon a close analysis one can discover its

meaning and thus the intent of Congress in using it by consulting the definitions within

Blacks Law 4th Edition which fit the situation;

a. **REASON**: "an inducement, motive, or ground for action as in the phrase "reasons for an appeal." Miller v Miller, 8 Johns. (N.Y.) 77.

b. **REASONABLE**: "Thinking, speaking, or acting according to the dictates of reason; not immoderate or excessive, being synonymous with rational; honest; equitable; fair; suitable; moderate; tolerable. Cass v State, 124 Tex.Cr.R. 208, 61 S.W.2d 500.

c. **REASONABLE AND PROBABLE CAUSE**: "It is a suspicion founded upon circumstances sufficiently strong to warrant reasonable man in belief that charge is true. Murphy v Murray, 74 Cal.App. 726, 241 P. 938, 940

d. **REASONABLE ACT**: Such as may fairly, justly, and reasonably be required of a party.

e. **BELIEF**: A conviction of the truth of a proposition, existing subjectively in the mind, and induced by argument, persuasion or proof addressed to the judgment. Keller v. State, 102 Ga. 506, 31 S.E. 92. "Knowledge is an assurance of a fact or proposition founded on perception by the senses, or intuition; while **"belief"** is an **assurance gained by evidence, and from other persons.** Brooks v. Sessoms, 47 Ga. App. 554, 171 S.E. 222, 224

f. **BREACH OF DUTY**: In a general sense, any violation or omission of a legal or moral duty. More particularly, the neglect or failure to fulfill in a just and proper manner the duties of an office or fiduciary employment. Every violation by a trustee of a duty which equity lays upon him, **whether willful and fraudulent, or done through negligence or arising through mere oversight or forgetfulness, is a breach of duty.** Hivick v. Hemme, 118 Okl. 167, 247 P. 692, 693.

17. NCO had a duty to verify the true identity of the "*alleged account holder*" rather than assume the information allegedly obtained from FIRST PREMIER BANK was accurate. With the well documented problems within the debt collection industry and the substantial litigation against them as a result, NCO knew or should have known that there were major discrepancies in the information with which they were working. NCO should have had procedures in place to verify all information before obtaining Plaintiff's credit report and invading his privacy. The language of the FCRA does not overcome a lack of due diligence required when dealing with the personal and private information of consumers nor does it define a "*reason to believe*" to be a simple acceptance of arbitrary information taken at face value. A "*reasonable belief*" does not equate to a lack of any semblance of due diligence to ascertain legitimacy and or correctness of the information being provided. Plaintiff had and has every reason to believe that NCO deliberately breached their duty to validate, verify and legitimize the "*alleged account*" before violating his rights and invading his privacy when they obtained his credit report in 2009.

18. The unsupported affidavits of an in-house employee of NCO do not constitute fact evidence that NCO did not purchase mere false information of an alleged debt, fail to authenticate the information, and then subsequently violate Plaintiff's privacy and civil rights in an attempt to fraudulently collect funds from him.

19. Nothing but computer screen shots and print outs of electronic entries of information which are easily created even by the least sophisticated computer user and are therefore inconclusive have been provided by NCO.

20. Defendant has cited a number of cases in an effort to support the doctrine of "*reason to believe*" to establish the existence of their claim to a "*permissible purpose*" in obtaining Plaintiff's credit report in 2009. None of the cases cited establish the definition and fact existence of a "*reasonable belief*" in this case:

a. **Huertas v Galaxy Asset Management, 641 F. 3d 28, (3rd Cir. 2011) (section 1681 b(3)(A) Defendant makes the statement;** *"NCO had a permissible purpose regardless of whether the debt is later disputed or determined to be invalid."* In the Huertas decision the court recognized that Huertas' filings indicated that he had previously filed bankruptcy but that it was unclear to the District Court whether Huertas was alleging that the defendants had attempted to collect a debt extinguished by bankruptcy proceedings. The District Court allowed Huertas to amend his complaint to assert such a theory however Huertas did not file an amended complaint within the time period given and explained later the debt had in fact not been discharged in bankruptcy. It is clear by the District Court's actions in allowing Huertas to assert the debt had been extinguished prior to the Defendants collection efforts that such a fact would have established an arguable theory to counter a Motion to Dismiss. Appellant, Huertas based his case on the question of "time barred debt" which was erroneous. The debt at issue had belonged to Huertas and he did not refute that point. **Nowhere in the Appellate Court's decision does the court state the collector would have had a permissible purpose regardless of whether the debt is later disputed or determined to be invalid. The duty to have procedures in place to avoid errors of collection efforts on invalid information was not addressed by the Court. Neither was the** *theory* **of** *"reason to believe"*.

b. **Miller v Wolpoff & Abramson, LLP, 309 Fed. Appx. 40, 2009 WL 270034, at \*3 (7th Cir. Mar. 19, 2009)** *"obtaining a consumer report for use in collecting a debt owed by the consumer is a permissible purpose"* In this case Mr. Miller never stated he did not owe the debt nor did he show that there was no *"reason to believe"* on the part of W & A that there was in a legitimate account to collect or that the account was in fact connected to Miller.

c. **Robinson v Greystone Alliance, LLC,** 2011 WL 2601573, at \*3 (D.Md. June 29, 2011) *"Debt collection is a permissible purpose for obtaining a credit report under the FCRA... As long as the debt collector has "reason to believe" that the consumer owes the debt, the debt collector may permissibly obtain the consumer's credit report without violating the FCRA"* Plaintiff, Robinson, in that case, made no attempt to argue the Motion for Summary Judgment, no attempt to bring forth any evidence or argument to support his claim or that Greystone did not have *"reason to believe"* that the debt was valid. In the alternative, Greystone provided nothing to substantiate their claim of a *"**reasonable belief**"* either. The Court in fact, had nothing but Robinson's original pleading and Greystone's claim they had *"reason to believe"* to go on. That is not the situation in this case as Plaintiff, William Carter will show.

d. **Smith v John P. Frye, P.C.,** 2011 WL 748363, at \*3 N.D.Ill. Feb. 24, 2011, *"obtaining a credit report in connection with collection of a debt is permissible under the FCRA"* Again this is a case like Robinson v Greystone where a pro se Plaintiff dropped the ball and failed to follow procedure or support his own position. The Court had no other choice but to grant the summary judgment. Once again this is not the situation in this action as Plaintiff, William Carter will show.

e. **Adams v LexisNexis Risk & Information Analytics Group, Inc.,** 2010 WL 1931135 at \*8 (D.N.J. May 12, 2010), "Courts recognize that collection is a permissible purpose for obtaining a consumer report under the FCRA." (emphasis and quotation marks omitted). "The essence of this case is not whether or not LexisNexis had a permissible purpose but if in fact their actions fell under the

definition of a Credit Reporting Agency (CRA). In the absence of that determination Plaintiff could not put forth a claim of impermissible purpose".

    f.  **Thomas v United States Bank, N.A.**, 325 Fed. Appx. 592 (9th Cir. May 19, 2009), *"requesting a credit report with the intent to collect on a debt is among the permissible purposes listed in the FCRA 15 U.S.C. § 1681b(a)(3)(A)."* This case is unpublished and Plaintiff is unable to locate it and therefore cannot address its content. Plaintiff does state the cited statute refers to collecting on an account which actually exists and does not state; *"intent to collect on a debt which may or may not exist"*.

21. Plaintiff cites *McFarland v Bob Saks Toyota*, 466 F. Supp.2d 855 E.D.Mich, 2006:

    a.  A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transportation Co.*, 446 F.3d 637, 640 (6th Cir.2006). "A dispute over a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Reeves, 446 F.3d at 640 (internal quotation marks and citation omitted). In its review of the record to determine whether there is such a "genuine issue as to any material fact," this Court "may not determine the credibility of witnesses or weigh evidence." 446 F.3d at 640. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." 446 F.3d at 640 (internal quotation marks and citations omitted). With these standards in mind, the Court turns to the present motion.

22. Defendant attempts to dismiss the "***plain language***" of the FAIR AND ACCURATE CREDIT TRANSACTION ACT OF 2003 (FACTA) enacted March 31, 2004 by citing *Demaestri v. Asset Acceptance Capital Corp.*, 2012 WL 1229907 at *4 (D.Colo. March 14, 2012):

    a.  "granting *the debt collector's motion to dismiss specifically finding the definition of "account" under the EFT irrelevant to the permissible purpose analysis.*" Plaintiff, Brian Demaestri failed in all issues to support his allegations even after specifically being given the opportunity to do so by the court. This case is not an appellate decision and is a good example of how the courts have failed to address the specific changes in definitions in the FCRA made by the FACTA amendments.

23. When looking at the changes made to definitions in the FCRA by FACTA, the court must look at not only the plain language of the definition in the statute but must also follow the progression of cross references within FACTA to determine the exact meaning of its definitions:

    a.  According to the **ELECTRONIC CODE OF FEDERAL REGULATIONS, Title 12, part 1022 FAIR CREDIT REPORTING (Regulation V)** the following terms are defined:

     i. §1022.3 (a) *Act* means the **FCRA (15 U.S.C. 1681et seq.**

     ii. § 1022.71 (p) *Open-end credit plan* has the same meaning as in **15 U.S.C. 1602(i),** as interpreted by the **Bureau in Regulation Z** (12 CFR part 1026) and the Official Interpretations to Regulation Z (Supplement I to 12 CFR part 1026). Which defines a *Credit Card* to be an *Open-end credit plan.*

b. According to **PUBLIC LAW 108-159- DEC. 4, 2003, FAIR AND ACCURATE CREDIT TRANSACTION ACT OF 2003 (FACTA), SEC. 111, AMENDMENT TO DEFINITIONS, Section 603 of the Fair Credit Reporting Act (15 U.S.C. § 1681a)**, is amended by adding at the end the following:

     i. The term "**credit card**" has the same meaning as in §103 of the **Truth in Lending Act**.

     ii. The terms "**account**" and "**electronic fund transfer**" have the same meanings as in §903 of the **Electronic Fund Transfer Act**.

c. According to **§103(k)** of the **Truth in Lending Act, U.S.C. 1602** the definition of the term "**credit card**" means any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

d. According to **§903(2)** of the **Electronic Fund Transfer Act, U.S.C. 15 U.S.C. 1693**, the term "**account**" means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an *open end credit plan* as defined in section **103(i) of this Act**), as described in regulations of the Board, (Board of Governors of the Federal Reserve System), established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement;

24. Nowhere within the statute does it definitively state that credit cards are included in the newly defined use of the word "**account**". As a matter of fact in plain language it states "(other than an occasional or incidental credit balance in an *open end credit plan* as defined in section **103(i) of this Act**) which specifically *excludes* that type of account from the definition." Defendant claims the "**alleged account**" for which it has been established Plaintiff was not responsible, was a **credit card** account. As such and in looking to the "**plain language**" used in FACTA, it would not have afforded NCO a "*reason to believe*" they had a permissible purpose to obtain Plaintiff's credit report.  Plaintiff does not rely solely on this issue in his allegations.

25. The United States Supreme Court has stated very clearly that the judiciary must look to the "plain language of the statutes" to determine the intent of the legislators.  "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain* 503 U.S. 249 (1992);

"the legislative purpose is expressed by the ordinary meaning of the words used." *Richards et al. v. United States et al.* 369 U.S. 1 (1962).

26. The fact that the Court granted the debt collector's motion to dismiss in *Demaestri v. Asset Acceptance Capital Corp.* (*Id.* ¶22), on the premise that the changes to the FCRA by FACTA is not applicable does not definitively establish that opinion as fact. Until there is an appellate decision on that issue it remains ripe for argument.

## CONCLUSION

27. Summary Judgment Standard *Murray v Chevrolet, Inc.* 441 F. Supp. 2d 940, Dist Ct. ND, Illinois 2006

   a. A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R.Civ.P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir.2001). "If, however, the record as a whole `could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* Once a motion for summary judgment has been filed, "the burden shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial." *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir.1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-movant must provide more than a "mere scintilla" of evidence to carry its burden under the summary judgment standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, weighing evidence, making credibility determinations, and drawing reasonable inferences are functions of a jury, not of a judge deciding a summary judgment motion. *Id.* at 255, 106 S.Ct. 2505.

28. It is Defendants' claim that "*reason to believe*" is the foundation for a "*permissible purpose*" under the FCRA yet NCO provides no evidence of a reasonable effort to authenticate the information given to them before invading Plaintiff's privacy by obtaining his credit report and subsequently calling his cell phone in excess of 100 times in 2009 and 2010.

29. On the basis of the high volume of business NCO does by their own admission on their web site it is unreasonable to assume the "*alleged account*" in question could have been reviewed sufficiently to provide NCO with a legitimate "*reason to believe*" in 2009.

30. The sheer number of accounts handled by NCO on a daily basis would require such speed that no independent judgment could be exercised. The fact is that no process in place to screen, verify, scrutinize or otherwise detect false or incorrect information has been identified as being used by NCO that could lead to them having "*reason to believe*" any specific account is legitimate.

31. The fact that NCO, and numerous other debt collection companies and banks, have such a horrendous track record regarding the accuracy of the information they are using to attempt to collect alleged debts and is used to obtain consumers' credit reports, should be evidence enough that there is NOT a system in place that could, *or would*, give them a "*reason to believe*" there is a debt to be collected without further reasonable due diligence being performed on information received from ANY other entity before contacting a consumer or obtaining their private credit information.  To not do so is a breach of their duty to protect the consumer from illegal intrusion into their private lives and information.

32.  While NCO may argue that they have "*reason to believe*" they can go into virtually any consumer's credit file and obtain their private information simply because they have some identifying information such as a name, address, social security number or other possible identifiers, they have proven themselves to be blatantly irresponsible in using that "*reason to believe*" **theory** to harass, oppress, and illegally steal from many consumers as evidenced by the substantial fines they have paid for violations and the growing litigation against them now that indicates the consumers have "had enough."

33. The court must also recognize that with the public knowledge of the substantial and REPEATED violations by NCO that there are, in all likelihood, many more consumers who

have been the victims of their unconscionable "collect at all costs" and "who cares what the law says" behavior that have never come forward and been identified, meaning the abuse by NCO and the debt collection industry as a whole is far worse than it would appear on the surface.

34. For the Court to allow this kind of continued abuse of consumers simply because someone says they have "*reason to believe*" something but have not DETERMINED they FACTUALLY have a basis for obtaining consumers' credit files is to aid and abet the debt collection industry and specifically NCO in their continued theft of consumers' private information and funds based on wholly inaccurate and in some cases BLATANTLY fraudulent information.

35. If NCO cannot prove they reviewed nothing more than the limited information provided in the affidavits of Gregory Stevens and the electronic entries provided thus far as a justification for invading Plaintiff's privacy with the "push of a button" and an "automatic dialing system", any reasonable jury could conclude they had no permissible purpose to violate Plaintiff's civil rights.

36. Affiant Gregory Stevens states he is the Vice President of Audit Compliance Operations Control and in 2009 he was Vice President of Customer Contact Management. As an executive officer it is highly unlikely Mr. Stevens would be involved in the day to day hands on operation of the authentication and maintenance of individual accounts. Having access to accounts does not equate to first hand fact knowledge of the details of any individual account. Mr. Stevens makes no reference to having been personally involved with any authentication of the "alleged account" in question at any time prior to NCO obtaining Plaintiff's credit report.

37. Defendant insists that Plaintiff provide evidence they had "*no permissible purpose*". Since NCO places its defense to the claim on a vague *theory* such as "*reason to believe*" it is

impossible for Plaintiff to do anything other than provide evidence of a dismal track record of non-compliance, point out the lack of evidence in the record that any reasonable effort to authenticate information was performed and hang his hat on the words of the Honorable Judge Sonia Sotomayor…… .. "These affidavits, however, lack sufficient detail to permit the district court or us to determine that their review was sufficient as a matter of law." **Miller v Wolpoff & Abramson, LLP**, 2d Cir., No. 02-7017, Feb.25, 2003

38. The comment by counsel for the defense over the telephone that their client is not God and therefore could not have known the alleged account did not belong to Plaintiff, blatantly exposes their flawed view that as opposed to the view of Judge Sotomayor their practices, policies and procedures are not to exercise reasonable judgment and not to exercise inquiry, effort and due diligence or a reasonable investigation. Defendant, NCO relies solely on having a "*reasonable belief*" whereas Judge Sotomayor states, it is not enough to have a "*reasonable belief*" as a matter of law.

39. In the immortal words of Judge Christopher Boyko from the Northern District of Ohio Case 1:07CV 02282, in his landmark decision of October 31, 2007 regarding numerous fraudulent foreclosures he said "The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate."

40. Essentially, obtaining a credit report on an individual solely on a *theory* of reasonable belief exposes the debt collector to liability for professional *negligence* and evidences a *willful* and *reckless disregard* for consumer protection and consumer financial privacy laws issuing forth from Congress.

WHEREFORE the Plaintiff has in fact shown that there are issues of material fact before this Honorable Court, Plaintiff respectfully requests that the Court deny defendants motion for summary judgment and allow this cause of action to go forward to trial on the merits. It is time for this Court to step up and stop NCO at the gate.

Dated: October 16, 2012

Respectfully Submitted,

William H. Carter
311 Bethel Street
Eastman, Georgia 31023

# EXHIBIT "N"
## AMERICAN BANKER
## JPM Chase Quietly Halts
## Jan. 10, 2012

# AMERICAN BANKER.

## JPM Chase Quietly Halts Suits Over Consumer Debts

**By** Jeff Horwitz
JAN 10, 2012 5:55pm ET

**JPMorgan Chase & Co. has quietly ceased filing lawsuits to collect consumer debts around the nation, dismissing in-house attorneys and virtually shutting down a collections machine that as recently as nine months ago was racking up hundreds of millions of dollars in monthly judgments.**

A sampling of court records in the major cities in five states shows that Chase collection suits have virtually disappeared. In a sixth state, Illinois, contract attorneys continue to file small-dollar cases, though at a reduced rate.

It is unclear whether Chase has stopped pursuing collection on many claims nationwide, or if intends to pursue the debts in some other fashion. The bank has not explained its apparent moratorium and declined comment.

Chase's halt does, however, follow scattered defeats in state courts and a whistle-blower's allegation that it falsely overstated the balances of thousands of delinquent accounts it sold to a third party. Former Chase employees and debt collection experts insist that the bank would not have abruptly retreated from its collections efforts in the absence of trouble.

In a sign that Chase acted with urgency, numerous regional collections teams were fired in mid-2011 at the order of the New York bank's headquarters, according to people familiar with the events.

"Nobody told anybody anything. It was very traumatic," says a former Chase attorney who asked to remain anonymous because of a nondisclosure agreement. "I think there were investigations by the [Office of the Comptroller of the Currency] and other government entities. If we're not there, we can't be interviewed."

The OCC declined to comment. Chase declined to say whether its moves were related to government investigations or legal concerns. In an email to *American Banker*, a spokesman for the bank called its collection strategy "proprietary."

Chase and other credit card issuers have historically filed lawsuits to compel consumers to repay defaulted loans. Such suits typically involve only a few thousand dollars each, but en masse add up; Chase recovered $1.4 billion from defaulted credit card accounts last year, according to its financial

filings with the Securities and Exchange Commission. (Not all of that necessarily came from judgments.)

Jerry Salzberg, a lawyer who represents debt collectors and banks in the Chicago area, was familiar with Chase's dismissed Illinois collections attorneys, whom he describes as experienced, productive and profitable.

"Someone from New York brought in the three lawyers, kicked them out with no warning and dismissed all their cases," Salzberg says. "These were people who were by the book. ... If they weren't the most profitable [of Chase's regional collection teams], they sure as hell were making a lot of money for the bank. ... Obviously something happened."

Chase collections cases have dropped off sharply in Illinois in recent months, in addition to disappearing in five other states, an American Banker review indicates. The review focused on California, Florida Maryland, New York and Washington, where local court records are electronically searchable.

In Dade County, Florida, which includes Miami, Chase filed 640 collections claims in January 2011, most seeking between $3,000 and $12,000. On Jan. 4 alone it filed suits seeking over $200,000, which represents a rate of $50 million annually.

But in April of last year, Chase ceased filing claims altogether in Dade County. That month, *The Wall Street Journal* first reported that Chase had dropped "more than a thousand" consumer debt cases around the country. Some contract attorneys cited documentation irregularities for the move, the paper reported.

Robo-signing, or the high-volume production of signed legal documents, has been a key element of the governmental and media foreclosure reviews. Chase's current pullback raises at least the possibility that at least some banks may have documentation problems in other business lines.

Academics and attorneys who defend consumers against debt claims have leveled their heaviest criticism at collection agencies rather than banks themselves. The agencies allegedly seek on a regular basis to collect debts in the absence of legitimate documentation. Efforts to collect a bank's own debt generally have been regarded by consumer advocates as more credible than those by collections agencies, which pursue secondhand claims.

"If sloppy record keeping and problems with false affidavits is a problem with mortgages, it's 100 times bigger in credit card accounts," says Michelle Weinberg of the Legal Assistance Foundation of Metropolitan Chicago. Even so, Weinberg says, "On documentation issues, it wouldn't occur to me that Chase wouldn't be able to prove up its own account."

So far judges have questioned the validity of banks' own consumer debt records in only a few low-profile cases. However, a whistle-blower claim settled last year raises further questions.

Linda Almonte, a former team leader in Chase's San Antonio credit card services division, accused the bank of firing her for objecting to the sale of $200 million in legal judgments obtained by bank attorneys. Half the accounts lacked adequate documentation of judgment and one-sixth listed the

wrong amounts owed, Almonte claimed in a suit filed in U.S. District Court for the Western District of Texas.

In its response, Chase did not dispute inaccuracies in the debt balances and documentation. Instead, it said its sales agreement allowed for errors and thus was proper. "[T]he parties explicitly agreed that the judgments were purchased 'as is' and "with all faults," Chase's attorney wrote.

Chase was unsuccessful in getting the case dismissed and settled it on undisclosed terms last April; it ceased filing new consumer debt lawsuits in many states the same month.

Should Chase stop pursuing such claims for any reason, the move could prove costly. The threat of litigation has an unquantifiable but significant influence on consumers' decisions to pay off their debts. What's more, even partial recoveries can be substantial and may already be declining as the result of Chase's pullback. After recouping $405 million in the first quarter of 2011, Chase's recoveries fell to $321 million in the second quarter and $266 million in the third quarter.

It is hard to say whether the absence of new suits has contributed to the decline. Credit card recoveries tend to be volatile and lag writeoffs. In the absence of its own collections activities, Chase could also be recouping money selling delinquent loans to collections agencies who then seek recoveries on their own. But a search for defendants in 10 cases that Chase dropped this spring did not uncover any surrogate claims.

*Next: A review of legal challenges in the consumer debt buying industry — and how banks can protect themselves from reputational and legal risks.*



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "O"

## AMERICAN BANKER
## How A Whistleblower...
## Mar. 15, 2012

# AMERICAN BANKER.

## How a Whistleblower Halted JPMorgan Chase's Card Collections

**By** Jeff Horwitz
MAR 15, 2012 5:54pm ET

*This is the second in a series on JPMorgan Chase's delinquent credit card collections operation. The first article can be viewed here. Further coverage will follow.*

**No sooner did Linda Almonte show up for work on November 30, 2009 than was she escorted out the door by security at JPMorgan Chase's Credit Card Litigation Support Group in San Antonio. A midlevel Chase executive who oversaw business process execution employees, Almonte says she was fired after just six months on the job for challenging her superiors about the accuracy of the bank's credit card records.**

Colleagues first learned of her dismissal later in the day when operations manager Jason Lazinbat, Almonte's former boss, gathered bank staff in a conference room and announced she was no longer with the bank. Under no circumstances, Lazinbat warned, were staffers to communicate with Almonte, recalls Carole McGinn, a quality control worker who spent 14 years at Chase. The account was confirmed by second employee, who requested to speak anonymously.

"It was an unusual statement," McGinn says. "Other people had left the bank, and we were not told" to cut off contact with them.

The contentious nature of Almonte's departure was a prelude to a series of events that serve as a cautionary tale for the banking industry. The former mid-level staffer eventually filed a whistleblower suit and complaints with regulators that accused Chase of a range of lapses over three years. They include: failure to reconcile the inconsistent past-due balances generated by the bank's computer systems; pressure from management to collect delinquent debts even in the absence of complete or accurate records; and robosigning of affidavits that brings into question the legal integrity of Chase's claims against tens of thousands of consumers.

Many of Almonte's accusations are backed by internal bank documents and current and former employees. What's more, they've forced Chase to cease operations in a collections unit that had previously generated billions of dollars in annual revenues.

Lazinbat did not respond to calls or email messages seeking comment, and the bank previously declined to speak on his behalf. Chase also declined to comment for this story on its own behalf or for the March 12 article.

After publication of that story, however, the bank released a statement saying: "Following issues raised with mortgage documents, we conducted an internal review across the firm and found other procedural issues. We immediately alerted our regulators and worked to address them." With its delinquent credit card customers, Chase added that in the "overwhelming majority of cases" its internal review indicated it had collected the correct amounts.

In contrast, Almonte charged in her wrongful termination suit that Chase fired her for resisting its efforts to sell faulty credit card debts. Chase, in its defense of the suit, made no effort to contest Almonte's allegations about the inaccuracy of its records or to proffer alternative explanations for her firing. Instead, it argued that it could release employees at will under Texas law and was within its rights to sell credit card accounts whose documentation was problematic or missing, as long as it informed buyers.

"[T]he parties explicitly agreed that the judgments were purchased 'as is' and 'with all faults,'" Chase wrote in a brief defending itself against Almonte's wrongful termination suit.

Almonte proved persistent, however. She contacted a number of regulators, including the Securities and Exchange Commission and Federal Trade Commission, expanding on allegations from her wrongful termination suit. She also discussed her complaints with officials from the Office of the Comptroller of the Currency, which oversees nationally chartered banks, including Chase. The OCC dispatched enforcement staffers to the bank's San Antonio facility for two months late last year as part of a still ongoing investigation, as *American Banker* previously reported.

A now defunct website, Legalmorass.com, took up Almonte's cause. The *Wall Street Journal* and the *New York Times* also mentioned her suit in stories on bank documentation problems.

Her attorney, Bruse Loyd of Jones, Gillaspia & Loyd, L.L.P, successfully opposed Chase's attempts to get her case dismissed in court. By then Almonte says she was nearly broke and living with her family in a motel as a result of her inability to find another job in banking. Almonte settled her suit with Chase last April on undisclosed terms and agreed to stop talking about her case.

But Almonte's efforts appear to have prompted the bank to order its in-house collections lawyers to undertake top-to-bottom reviews of "reconciliation," the process by which the bank was supposed to ensure that its legal filings matched the its internal records. That's according to a former Chase attorney who spoke on condition of anonymity.

The bank had never undertaken such reviews before. When pressed by lawyers in the field for an explanation, senior officials at Chase's New York headquarters stated that the OCC was making inquiries about Almonte's allegations, according to the former Chase attorney.

The reviews concluded that Chase's in-house legal work was solid, this person adds. Former members of the bank's litigation support staff agree. However, they add that the serious problems existed elsewhere. Namely, in the bank's back-offices and with outside collections firms, which had limited access to Chase's internal records and financial incentives to recoup as much as possible from consumers.

Instead of focusing solely on those areas, Chase around the middle of last year fired Gail Siegel, who had formerly run its internal collections litigation teams, bank sources say. Then, around the time it settled with Almonte, Chase ordered its in-house and contract law firms to drop outstanding card-related litigation altogether.

Virtually overnight, Chase mothballed a legal operation that had been producing several billion of dollars in legal judgments a year and more than $1.2 billion in recoveries. Over the next few months, Chase also fired the lead attorneys in most of its satellite offices.

Jerry Salzberg, an Illinois collections attorney was friendly with members of the bank's Chicago litigation office.

"Someone from New York brought in the three lawyers, kicked them out with no warning and dismissed all their cases," he told *American Banker* in January. "These were people who were by the book. ... If they weren't the most profitable [of Chase's regional collection teams], they sure as hell were making a lot of money for the bank. ... Obviously something happened."

Chase extended its collections revamp to its San Antonio operation last fall, when it announced changes to its longstanding document-signing policies. Previously, management of the credit card litigation support group had instructed employees to use corporate officer titles that existed only for the purposes of signing documents. Often, stacks of affidavits had been signed without a notary being present, as required by law, current and former employees say.

Under the revamp, Lazinbat announced last October that effective immediately Chase was setting up "signing rooms" where employees would review and sign collections files in the presence of notaries.

The reason for the urgency became apparent the following Monday, when OCC investigators arrived, says an employee who worked at the facility at the time. The OCC staff departed last December, after a two-month review of the San Antonio unit, with a large quantity of Chase records in tow.

The scope of the agency's review remains unclear, current and former bank employees say. The OCC declined comment on Chase. In practice, its enforcement reviews generally take months to complete, it said.

Four months after the OCC's departure, Chase insiders say talk has circulated that the bank might resume filing suits against card customers with large delinquent balances.

Meanwhile, in-house card collections attorneys who remain are twiddling their thumbs.

"They [Chase managers] have a lot of people on their payroll," says the former Chase in-house attorney. "I know people sitting in the offices, and they literally don't do anything. People are extremely stressed."

"It's really too bad," says a former Chase attorney who was terminated. "They wanted to file more and more, and they grew too fast. Maybe they just got greedy."

JPMorgan Chase's annual report, filed with the SEC last month, made no reference to its 11-month litigation hiatus or any impact on earnings.

*Next: JPMorgan Chase's deals with debt buyers raise doubts about industry standards and the validity of related consumer lawsuits.*

 © 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "P"

## AMERICAN BANKER
## OCC Probing JP Morgan Chase Credit Card..
## Mar. 12, 2012

# AMERICAN BANKER.

# OCC Probing JPMorgan Chase Credit Card Collections

**By** Jeff Horwitz
MAR 12, 2012 9:24pm ET

*First in a series*

JPMorgan Chase & Co. took procedural shortcuts and used faulty account records in suing tens of thousands of delinquent credit card borrowers for at least two years, current and former employees say.

The process flaws sparked a regulatory probe by the Office of the Comptroller of the Currency and forced the bank to stop suing delinquent borrowers altogether last year.

The bank's errors could call into question the legitimacy of billions of dollars in outstanding claims against debtors and of legal judgments Chase has already won, current and former Chase employees say.

For the banking industry at large, the situation at Chase highlights the risk that shoddy back-office procedures and flawed legal work extends well beyond mortgage servicing.

"We did not verify a single one" of the affidavits attesting to the amounts Chase was seeking to collect, says Howard Hardin, who oversaw a team handling tens of thousands of Chase debt files in San Antonio. "We were told [by superiors] 'We're in a hurry. Go ahead and sign them.'"

Hardin left the bank in 2010 to work in a different industry.

Chase declined repeated requests to discuss details of its consumer debt collection activities.

Company documents, court filings, and interviews with seven current and former employees reveal that Chase's credit card litigation operation was allegedly plagued by unreliable external attorneys, management's disregard for accuracy, and patchy technology.

The bank's computer systems frequently disagreed about how much debtors actually owed, several of the Chase sources say.

The employees' stories corroborate allegations made by Linda Almonte, a former mid-level business process executive in Chase's San Antonio-based Credit Card Litigation Support Group. Dismissed in November 2009 after six months on the job, Almonte filed whistleblower complaints and a wrongful termination suit claiming that she was fired for objecting to the sale of credit card debts with erroneous balances.

Almonte's complaints drew the attention of the OCC, former Chase employees say, and led to the April 2011 shutdown of a formidable collections operation that generated several billion dollars of legal judgments every year.

Few details of the OCC's investigation are available, but current and former Chase employees confirm that staffers from the agency's enforcement division spent two months gathering information in the San Antonio facility late last year. A person familiar with the OCC's review says that the regulator is taking the situation very seriously.

This is the first article in a series that will look at what allegedly went wrong in Chase's credit card litigation operation — and how those missteps could roil the banking and debt collection industries.

### 'Outhouse' Attorneys

The root of Chase's card collections failures was more machine than man. Chase maintains a patchwork of computer systems that don't always communicate well, according to former employees who used them. Meet TSYS, TCSF and RMS.

TSYS is what outsiders assume a global bank's customer data system looks like. Licensed from Total Systems Services Inc. and managed by Chase, it's the modern and versatile system that consumers ultimately talk to when they check their credit card balance online.

TSYS only handles current accounts, however. When customers stop paying credit card bills, their accounts are passed to TCSF, for collections and litigation, and eventually to RMS for charge-offs.

Each of Chase's systems handles its own tasks just fine. The problem employees faced is that TCSF and RMS can only talk to each other through TSYS, and each of the systems operates by its own rules. This means that when presented with the question of how much a customer owes, each might spit out a different answer.

"I came across that on a regular basis," says Carole McGinn, who retired in 2010 from the credit card litigation support group in San Antonio. The discrepancies were usually minor, she and three other employees say, but payments by heavily delinquent borrowers would throw the records seriously out of whack.

"There was no way to reconcile those balances that I knew of," says McGinn, who worked at Chase for almost 15 years.

To overcome this problem, Chase's business process staff reviewed records in multiple systems and reconciled the accounts manually.

Chase's relationship with outside debt collectors posed another potential glitch. In populous states like California, Illinois and Florida, the bank employed in-house attorneys who were wired into all of its relevant computer systems.

Elsewhere, it relied on what credit card litigation staffers referred to as "outhouse attorneys." Paid according to how much money they recovered, the outsiders were connected only to TCSF, the

litigation system. Former Chase employees say some of the firms, such as the since-imploded Mann Bracken LLP, were known for poor recordkeeping.

Chase's San Antonio crew was well versed in dealing with their computer systems' quirks and the outside firms' foibles. They adjusted accordingly, monitoring outside law firms for errors and stripping inaccurate charges from accounts.

"We made it work," says a former employee.

**"Everything in Dollars Collected"**

Things began to change in 2008, when Chase replaced the credit card division's San Antonio management, current and former Chase employees say. The bank installed Edmond Helaire as the San Antonio operations director, and he hired Jason Lazinbat as his No. 2.

Chase staffers who spoke with *American Banker* say they were never told the reason for the house-cleaning, but several speculate that the bank was looking to increase recoveries. Even before the financial crisis made a shambles of consumers' finances, Chase's expanding credit card portfolio and growing propensity to sue for unpaid debts had dramatically increased the volume of cases it handled.

At the beginning of the last decade, Chase recouped $130 million a year from bad consumer debt of all stripes. By 2009, recoveries on credit cards alone exceeded $1.2 billion. Over the next two years, the bank would charge off more than $20 billion in credit card accounts. Litigation was the most profitable way to handle the bad debts.

Lazinbat was a Chase veteran with experience overseeing teams of debt collectors. He chafed at what he saw as the duplicative checks and balances that the old guard considered essential to ensuring the numbers were accurate, former employees say.

Lazinbat "measured everything in terms of number of dollars collected," says a former Chase employee who requested anonymity. "He did not understand that in the process world, that's not what you look at. That's not the metric."

Chase spokesman Paul Hartwick responded to messages left for Lazinbat, who declined to comment.

Rank-and-file staff began complaining about orders to take shortcuts as part of the broader culture clash, current and former employees say. The conflict ended when Lazinbat and Helaire terminated several key mid-level officials in 2008 and early 2009, employees say.

**"Documents Were Trashed"**

One of the replacements brought in was Linda Almonte, a congenitally upbeat former Washington Mutual process execution manager who gets excited about Six Sigma quality control.

By the time of Almonte's May 2009 arrival, the rapidly expanding portfolio of delinquent accounts and the quirks in Chase's systems had produced serious problems, she and others say.

The outside attorneys were one flashpoint. The records the law firms used to sue people sometimes differed from Chase's own files at an alarming rate, according to a routine Chase presentation prepared by Almonte and later submitted to the Securities and Exchange Commission. Some law firms' records disagreed with Chase's in almost 20% of cases sampled, a rate far above what is regarded as an acceptable level of errors.

"That's horrendous," says a former Chase attorney who was informed of the numbers by *American Banker*.

The outsiders' lack of access to TSYS was one weakness. Another was that the law firms' recovery-based pay encouraged slapdash work, says the former attorney and other former Chase employees.

"They did not make a meaningful review of what they had," the attorney says.

The staff of the Credit Card Litigation Support Group grappled with quality control and how to ascertain that customers did, in fact, owe the company money. In one Chase email, Almonte suggested to Lazinbat that the bank should negotiate with delinquent customers before suing them. Doing so, she wrote, would "weed out additional accounts that were settled or payments made that are not showing up in the system."

Other things were falling through the cracks. Borrower correspondence sent to the San Antonio facility, such as bankruptcy notifications, address changes, and hardship requests were being dropped on an unmanned desk, according to a 2009 printout from Chase's troubleshooting log.

"There is no existing ... process in place that states what action should take place when ... this correspondence is received," notes a log entry submitted by an employee.

(The emails and internal records cited in this story are pulled from Almonte's whistleblower complaints. While Chase has declined to discuss them, former employees attested to the documentation's apparent legitimacy.)

Documents weren't simply misplaced: Chase shredded incoming correspondence such as records of borrower payments and counter-judgments extinguishing debts, Almonte alleged in her wrongful termination suit.

While none of the people who spoke with *American Banker* witnessed this, McGinn says she also heard colleagues acknowledge that some correspondence had been destroyed.

"I understand there were documents trashed, yes," she says. *McGinn retired from the San Antonio facility in June of 2010 after she says she became uneasy with how it was being managed.*

"My mouth was going to get me in more trouble than I could live with," McGinn says.

**Three Signers, Billions in Debt**

Former Chase employees say they used to consider the mass production of affidavits by document signers to be at most a technical concern. This is because quality control staff traditionally vetted the files thoroughly for bankruptcies, identity theft, and errors before passing the documents to signers.

But given their growing concerns about possible errors in underlying collections and litigation records, these procedural issues began to seem substantive.

One of Chase's most prolific affidavit signers was Ruben Alcaraz, one of three San Antonio liaisons with the in-house collections attorneys, court filings indicate. By law, collection affidavits require the signer to be familiar with the bank's pertinent records.

(The failure to follow similar procedures in the mortgage market is what created the industry's foreclosure robosigning problems.)

"Based upon my review of the Plaintiff's books and records of Defendant's account(s), I have personal knowledge of the facts set forth in the attached pleading," states one Pennsylvania card-debt affidavit signed by Alcaraz. "This verification is made subject to the penalties of [Pennsylvania law] relating to unsworn falsification to authorities."

Numerous former employees say that Alcaraz and his colleagues rarely if ever reviewed such files. They routinely signed stacks of affidavits on flights and in meetings, which in some cases were attended by Helaire, Lazinbat and Chase compliance staffers. Nobody objected, Almonte and others say.

Alcaraz also describes himself in the court documents as an "officer of the bank" and an "Assistant Treasurer." High-level Chase management had instructed the staff to stop signing documents using such titles around the middle of the last decade, four Chase sources say. But Lazinbat ordered them to do it anyway. An operator for Chase's internal switchboard identified Alcaraz as a "business analyst."

"Hardly, if ever, was anything verified," Almonte's SEC complaint states. "There was constant complaining by the Attorney Liaisons about having to manually sign these affidavits ... they always questioned why they could not have them digitally signed in bulk."

"Each and every one of those [affidavits] should have been manually checked," says Hardin, framing the issue as one of basic quality control. "There was a lot of need for diligence, and sometimes that just didn't happen."

A message left for Alcaraz was returned by Chase spokesman Hartwick, who said that Alcaraz declined to comment.

## "A Huge Cleanup"

Almonte says she initially limited her criticism of Chase's operations to pushing internally for improvements.

"I have a lot of areas where the ball was dropped ... and now we have a huge cleanup," she wrote in an email to Lazinbat in October 2009.

While Almonte says her relationship with Helaire and Lazinbat was initially excellent, it fell apart when she began questioning how the bank was handling the sale of $200 million of legal judgments to an outside debt collection company.

Nearly half of the files her team sampled were missing proofs of judgment or other essential information, she wrote to colleagues. Even more worrisome, she alleged in her wrongful-termination suit, nearly a quarter of the files misstated how much the borrower owed.

In the "vast majority" of those instances, the actual debt was "lower that what Chase was representing," her suit stated.

Among the files Chase was selling, Almonte said, were former Providian Financial Corp debts that had previously belonged to the failed Washington Mutual. (JPMorgan acquired Wamu's assets from the Federal Deposit Insurance Corp. in 2008.) The Providian files had been labeled with a code that that the credit card litigation group used to signal "toxic waste," she says.

Another person familiar with the files confirmed that the Providian accounts were commonly referred to with that term. The debt had long been considered unreliable and lacked documentation. It was never supposed to be sold, this person says.

A review of state court records shows that second-hand debt buyers are suing people who allegedly owe money on the Chase-Wamu-Providian accounts, however. Informed that the files have surfaced in court, the former Chase employee who confirmed the files' "toxic" status was appalled.

"That's crazy," the person says. "I can't believe they [Chase officials] did that."

Almonte called for the bank to halt the debt sale, but was warned by Lazinbat that "she had better go along with the plan to sell the misrepresented asset," she later wrote in her employment lawsuit.

Almonte says she refused Lazinbat's order and escalated her concerns to his boss, Helaire. Chase fired her on Nov. 30, 2009.

Carole McGinn was not a party to discussions about the debt sale but confirms the thrust of Almonte's claims. "I know she [Almonte] was looking into things that they didn't want her looking into," McGinn says.

The following March, Almonte filed her wrongful termination suit. First reported by the *San Antonio Express-News*, the case brought Chase's alleged problems into public view.

"This is not an accident anymore," Almonte now says. "The same people who created this problem at Chase are still in charge. They aren't going to fix it unless they're forced to."

*NEXT: Almonte sues. The OCC gets interested. Chase fires in-house collections attorneys and the reliability of its judgments comes into question.*

 **SOURCEMEDIA**

© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "Q"

## AMERICAN BANKER
## Bank of America Sold Card Debts...
## Mar. 29, 2012

# AMERICAN BANKER.

## Bank of America Sold Card Debts to Collectors Despite Faulty Records

**By** Jeff Horwitz
MAR 29, 2012 6:31pm ET

**Bank of America has sold collections agencies rights to sue over credit card debts that it has privately noted were potentially inaccurate or already repaid.**

In a series of 2009 and 2010 transactions, Bank of America sold credit card receivables to an outfit called CACH LLC, based in Denver. Co. Each month CACH bought debts with a face value of as much as $65 million for 1.8 cents on the dollar. At least a portion of the debts were legacy accounts acquired from MBNA, which Bank of America purchased in 2006.

The pricing reflected the accounts' questionable quality, but what is notable is that the bank could get anything at all for them. B of A was not making "any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever" about the accuracy or completeness of the debts' records, according to a 2010 credit card sales agreement submitted to a California state court in a civil suit involving debt B of A had sold to CACH.

In the "as is" documents Bank of America has drawn up for such sales, it warned that it would initially provide no records to support the amounts it said are owed and might be unable to produce them. It also stated that some of the claims it sold might already have been extinguished in bankruptcy court. B of A additionally cautioned that it might be selling loans whose balances are "approximate" or that consumers have already paid back in full. Maryland resident Karen Stevens was the victim of one such sale, which resulted in a three-year legal battle (see related story).

Bank of America declined requests to comment for this story, other than to say through spokeswoman Betty Riess that it works with credit card customers to try to resolve delinquent debt issues. CACH did not respond to several phone and email messages seeking comment on the terms of its purchases.

Some industry observers said that the language in Bank of America's sales documents should be regarded as standard legalese intended to protect it against a disgruntled buyer's legal claims. And even though Bank of America refused to stand behind the accuracy of the records it sold, debt buyers are the ones who make the call to sue.

"The buyer has the primary responsibility to test the ... quality of what they're buying," says Samuel Golden, a former OCC ombudsman who is a managing director at consulting firm Alvarez & Marsal in Houston, Texas.

Collectors' responsibilities aside, other banks' sales agreements suggest Bank of America's standards are emblematic of wider industry practice that raises risk management concerns. For less than $1.2 million a month — a rounding error on B of A's income statement — the company sold CACH accounts that raise regulatory and reputational questions about the accuracy of its records and its disclosures to courts.

## Industry Practice

As the originators of credit card loans, banks are at the headwaters of the rivers of bad debt that flow into the collections industry. Over the last two years, Bank of America has charged off $20 billion in delinquent card debt. The bank settles or collects a portion of that itself and retires other accounts when borrowers go bankrupt or die. An undisclosed portion of the delinquent debt gets passed along to collectors. Once sold, rights to such accounts are often resold within the industry multiple times over several years.

Bank of America's caution that its card records may be incomplete or inaccurate suggests that documentation and accuracy problems may originate at the debt's source. Other banks' debt sale contracts acknowledge potentially large holes in their records as well.

One such example involves a 2009 U.S. Bancorp forward flow agreement, which outlines plans to sell a certain volume of delinquent accounts in the future. U.S. Bancorp's agreement states that it may have failed to credit borrowers for some payments and only guarantees the accuracy of account balances within a 10% margin of error.

Teri Charest, a spokeswoman for the bank, noted that the contract had expired and said that, regardless of such past contractual language, the bank scrubs its card data and that the claims it sells are accurate.

JPMorgan Chase, meanwhile, drafted an agreement to sell $200 million of credit card debt to Palisades Collection in 2008, even though records proving the debt might be unavailable for close to half the claims. "Seller represents and warrants that documentation is available for no less than 50% of the Charged-off Accounts," JPMorgan Chase's sales agreement stated.

The bank declined to comment. Palisades' chief counsel Seth Berman says the company has not bought Chase card debt in several years, but that its standards were always high.

The U.S. Office of the Comptroller of the Currency is already investigating JPMorgan Chase's handling of credit card debt records, as reported by *American Banker* earlier this month. A group of current and former employees described at the time how the bank had sold card accounts previously deemed "toxic waste" and which suffered from errors in the amounts being claimed.

## CACHing In

At Bank of America, records declared unreliable yet sold to CACH were used to file thousands of lawsuits against consumers, according to a review of hundreds of cases in the state courts where collection suits are typically filed. The overwhelming majority of cases end in default judgments, which are awarded to creditors when borrowers don't show up to contest the claims made against them.

In cases where debtors do challenge collections demands in court, the original bank-creditor must testify about the documentation supporting the claims. In several such instances, people identified as Bank of America employees have submitted affidavits attesting to the validity of debts sold by the bank to collections firms.

Even though Bank of America previously disavowed "the accuracy of the sums shown as the current balance," the sworn statements vouch for the borrowers' debts down to the penny and declare that the bank's "computerized and hard copy records" back the claims. There are other possible discrepancies, as well: the affidavits state that B of A "has no further interest in this account for any purpose," while the sales contracts reference a "revenue sharing plan."

The prospect that B of A was selling unreliable credit card debts did not deter CACH from buying them. A subsidiary of SquareTwo Financial, CACH does not collect debts itself. Instead, it operates like a restaurant franchiser, acquiring rights to the delinquent debts that are the raw materials of the collections business. It then works with law firms around the country that do the actual collections work, providing them with debt files, court witnesses and other services.

In thousands of cases in state courts, CACH has appended a single page from its purchase agreements with Bank of America attesting to its ownership of delinquent credit card debt. CACH has omitted from many such filings the more than 30 additional pages where Bank of America disclaims the accuracy of its debt records. Even so, attorneys affiliated with CACH have cited the reliability of Bank of America's records as the foundation for their collections lawsuits.

In the case involving CACH in Duval County, Florida, a person described as B of A "Bank Officer" Michelle Samse swore in an affidavit that "There is due and payable from WENDY CODY as of 9/18/2009 the sum of $12266.83." The Samse affidavit, typical of many others, went on to say "The statements made in this affidavit are based on the computerized and hard copy books and records of Bank of America, which are maintained in the ordinary course of business." Attempts to contact Samse and Cody through Bank of America switchboards and public records searches were unsuccessful.

**Trust Us**

The degree of precision attested to regarding Cody's debt is curious, considering that Bank of America declared it was unable to produce records to back it up. "[T]he original contract in this matter has been destroyed, or is no longer accessible," Samse's affidavit states. "This affidavit is to be treated as the original document for all purposes."

The affiliate representing CACH in the Cody case was Collect $outheast, which uses the phrase "Let us show you the MONEY!" in company promotions. Collect $outheast and Florida attorneys representing CACH in other cases did not respond to requests for comment.

Taras Rudnitsky, a consumer defense attorney in Lake Mary, Florida has regularly defended consumers against lawsuits filed by CACH affiliates in Duval County. He says he regularly demands that debt buyers file banks' sales agreements with the court and invariably runs into stiff opposition.

"In every single case I have involving a debt buyer, they refuse to produce a forward flow agreement," he says, referring to the term for sales contracts under which banks agree to sell a specific number of delinquent accounts in the future. "When push comes to shove, the case disappears."

**Weak Link**

For individual clients, dismissal of such a case is a victory, but such outcomes are the exception. In the vast majority of collections suits, consumers fail to respond to card payment demands and become liable for default judgments, says Peter Holland, who runs the University of Maryland Law School's Consumer Defense clinic and has collected some of the forward flow agreements. As a result, the questionable reliability of second-hand debt claims is failing to receive the attention it deserves, he says.

"The [terms of] forward flows are being hidden from the public and from the courts," says Holland. "When the banks say explicitly that they don't have the documentation, that's something courts need to know. When a bank says a balance is 'approximate,' that's something courts and consumers need to know."

To date, it is debt collectors who have been the main focus of complaints and lawsuits alleging wrongdoing. In the past year alone, collections firms have paid out a number of multi-million dollar settlements over allegations they robo-signed affidavits, failed to produce evidence to support payment demands and sued consumers over debts that were no longer owed.

According to a trade organization for the collections industry, much of the criticism of collectors' records stems from banks' failure to provide adequate documentation of debts.

"We're not getting what we need from the seller," says Mark Schiffman, a spokesman for the American Collections Association, which wants to see better recordkeeping and more documentation included in debt sales. "Consumer groups want to see original contracts and original documentation. That would make a lot of these debts disappear because a lot of that documentation may not exist."

**Regulatory Interest**

Washington regulators are beginning to look at what responsibility banks have for wrongful collections activity. But questions about jurisdiction and whether banks will get roped in remain open.

"Not enough information [is] flowing through to debt collectors," says Tom Pahl, an assistant director in the Federal Trade Commission's division of financial practices. Despite its concern, the FTC lacks the authority to regulate financial institutions

"We can't reach the banks to say 'Thou shalt file the following pieces of information with the loans,'" Pahl says. "We're trying to do most of this through either law enforcement, which is case-by-case, or by jawboning the industry."

The Consumer Financial Protection Bureau has jurisdiction over credit cards and last month announced plans to take a close look at the collections industry. The bureau's interest has been heightened by revelations of abuses by mortgage servicers, including robosigning of affidavits, according to spokeswomen Jennifer Howard.

The CFPB is "very concerned that the same shortcuts and violations may be occurring with other kinds of debt collection," she says.

The OCC, which likewise oversees banks, declined to comment on specific institutions' sales of credit card receivables. However, it expects banks to adhere to high standards regarding account records, especially in cases where institutions attest under oath to their accuracy, according to OCC spokesman Bryan Hubbard.

"There may be reasons it's hard to do. Large portfolios being bought. Systems integration. But banks are still accountable for maintaining accurate records," says Hubbard.



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "R"
## ACCOUNT NOTES OF
## FIRST PREMIER BANK

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### DUBLIN DIVISION

William H. Carter
     Plaintiff

vs

NCO FINANCIAL SYSTEMS
     Defendant

)
)
)
)
)
)
)
)
)

**Case No: CV 311-107**

## CERTIFICATE OF SERVICE

This is to certify that I have mailed copies of the above document by first class mail USPS to all parties listed below.

Dated: October 16, 2012

Respectfully Submitted,

William H. Carter
311 Bethel Street
Eastman, Georgia 31023
478-689-0708

NCO FINANCIAL SYSTEMS
C/O Glenn E. Jones
Hall, Booth, Smith & Slover, P.C.
3528 Darien Highway, Suite 300
Brunswick, Georgia 31525
(912) 554-0093